UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

ATIF F. BHATTI; TYLER D. WHITNEY;
and MICHAEL F. CARMODY,

        Plaintiffs,

v.

THE FEDERAL HOUSING FINANCE
AGENCY; MELVIN L. WATT, in his
official capacity as Director of the Federal
Housing Finance Agency; and THE
DEPARTMENT OF THE TREASURY,

        Defendants.

Case No. 17-CV-2185 (PJS/HB)

ORDER

---

Scott G. Knudson and Michael M. Sawers, BRIGGS AND MORGAN, P.A., for
plaintiffs.

Robert J. Katerberg, Howard N. Cayne, and Asim Varma, ARNOLD & PORTER
KAYE SCHOLER LLP; Mark A. Jacobson, Karla M. Vehrs, and Christopher
Proczko, LINDQUIST & VENNUM LLP, for defendants Federal Housing
Finance Agency and Melvin L. Watt.

Robert Charles Merritt, UNITED STATES DEPARTMENT OF JUSTICE; Craig R.
Baune, UNITED STATES ATTORNEY'S OFFICE, for defendant Department of
the Treasury.

Plaintiffs are shareholders in the Federal National Mortgage Association

(commonly known as "Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage

Corporation (commonly known as "Freddie Mac" or "Freddie").  Fannie and Freddie

(collectively, "the Companies") are federally chartered, for-profit, publicly traded

corporations that are in the business of purchasing and guaranteeing mortgages and bundling them into securities. Both companies are regulated by defendant Federal Housing Finance Agency ("FHFA").

In 2008, in the midst of the Great Recession, FHFA placed Fannie and Freddie into conservatorship—and then, acting in its capacity as conservator on behalf of the Companies, FHFA entered into preferred stock purchase agreements ("PSPAs") with the United States Department of the Treasury ("Treasury"). Under the PSPAs, Treasury made billions of dollars available to Fannie and Freddie in exchange for shares of the Companies' stock. Over the years, the parties amended the PSPAs from time to time. In August 2012, FHFA and Treasury amended the PSPAs for the third time in order to restructure the calculation of dividends to be paid to Treasury. Under this Third Amendment (which is still in effect), Fannie and Freddie pay a quarterly dividend to Treasury that is roughly equal to the amount by which their net worth exceeds zero.

The Third Amendment is deeply unpopular among some of the Companies' shareholders, and they have launched at least two waves of lawsuits in an attempt to undo it. The first wave of litigation attacked the Third Amendment directly. When that wave largely failed, shareholders launched a second wave of litigation (including this lawsuit). In the second wave of litigation, shareholders are attacking the Third Amendment indirectly by challenging the legality of FHFA itself—hoping that, by

killing the tree, they can kill one of its fruits. Plaintiffs in this particular lawsuit challenge the structure of FHFA (specifically, the fact that it is headed by a single director who can be removed only for cause). Plaintiffs also challenge the way that FHFA is funded and limitations on judicial review of FHFA's actions as conservator. Plaintiffs further challenge the length of the term that was served by an acting director of FHFA. And finally, plaintiffs challenge Congress's grant of conservatorship powers to FHFA.

This matter is before the Court on defendants' motions to dismiss and plaintiffs' motion for summary judgment. For the reasons that follow, defendants' motions are granted, and plaintiffs' motion is denied.

## I. BACKGROUND

### A. Regulatory Structure

Fannie and Freddie are for-profit, stockholder-owned corporations whose activities include purchasing, guaranteeing, and securitizing mortgages originated by private lenders. Am. Compl. ¶ 10. From 1992 until 2008, the Companies were regulated by the Office of Federal Housing Enterprise Oversight ("OFHEO"). Am. Compl. ¶ 13.

In July 2008, after the subprime mortgage crisis triggered the Great Recession, Congress passed the Housing and Economic Recovery Act ("HERA"), Pub. L. 110-289,

122 Stat. 2654 (July 30, 2008). Am. Compl. ¶¶ 7, 14, 25. HERA established FHFA as the successor to OFHEO. Am. Compl. ¶¶ 7, 14; 12 U.S.C. § 4511. Congress established FHFA because it found that "more effective Federal regulation is needed to reduce the risk of failure" of Fannie and Freddie. 12 U.S.C. § 4501(2). Under HERA, FHFA is responsible for overseeing the "prudential operations" of Fannie and Freddie and ensuring that they operate "in a safe and sound manner" consistent with the public interest; that they "'foster liquid, efficient, competitive, and resilient national housing finance markets"; and that they have "adequate capital and internal controls." 12 U.S.C. § 4513(a)(1).

FHFA is headed by a single director nominated by the President and confirmed by the Senate. 12 U.S.C. § 4512(a), (b)(1). The director serves a term of five years but can be removed by the President for cause. *Id.* § 4512(b)(2). FHFA also has three deputy directors appointed by the director. *Id.* § 4512(c)-(e). If the director leaves office or is incapacitated before his or her term concludes, the President must designate one of the three deputies to serve as acting director until a successor is appointed or the director returns. *Id.* § 4512(f).

HERA gives FHFA the authority to place Fannie and Freddie into a conservatorship or receivership under certain circumstances "for the purpose of reorganizing, rehabilitating, or winding up the affairs" of the Companies. 12 U.S.C.

§ 4617(a)(2).  Upon appointment as conservator or receiver, FHFA succeeds to "all

rights, titles, powers, and privileges of the regulated entity, and of any stockholder,

officer, or director of such regulated entity with respect to the regulated entity and the

assets of the regulated entity[.]"  *Id.* § 4617(b)(2)(A).  When FHFA acts as a conservator,

the agency is "not . . . subject to the direction or supervision of any other agency of the

United States . . . ."  *Id.* § 4617(a)(7).  In addition, HERA limits the extent to which courts

may "take any action to restrain or affect the exercise of powers or functions of the

[FHFA] as a conservator . . . ."  *Id.* § 4617(f).

FHFA is independently funded from annual assessments imposed on Fannie and

Freddie—assessments that are "not . . . construed to be Government or public funds or

appropriated money."  12 U.S.C. § 4516(a), (f)(2).

## B.  FHFA Directors

Pursuant to statute, FHFA's first director was James Lockhart, who at the time of

the enactment of HERA was serving as director of OFHEO.  Am. Compl. ¶ 42; *see also* 12

U.S.C. § 4512(b)(5).  Lockhart resigned as FHFA director in August 2009.  Am. Compl.

¶ 42.  President Obama then designated deputy director Edward DeMarco to serve as

acting director.  Am. Compl. ¶ 43.  In November 2010, President Obama nominated

Joseph Smith, Jr., to serve as FHFA director.  Am. Compl. ¶ 44.  The Senate failed to

confirm Smith, however.  Am. Compl. ¶ 44.  In May 2013, President Obama nominated

Melvin Watt to serve as FHFA director. Watt was confirmed by the Senate on December 10, 2013 and sworn into office on January 6, 2014. Am. Compl. ¶¶ 44.

## C. The Conservatorship and the PSPAs

As noted, FHFA placed Fannie and Freddie into conservatorship on September 6, 2008. Am. Compl. ¶ 28. The next day, Fannie and Freddie (acting through their conservator, FHFA) entered into the PSPAs with Treasury. Am. Compl. ¶ 31. Under the original PSPAs, Treasury committed to provide up to $100 billion to each Company to ensure that it maintained a positive net worth. Am. Compl. ¶ 32. For any quarter in which a Company's liabilities exceeded its assets, the PSPAs authorized the Company to draw on Treasury's commitment up to the amount of the shortfall. Am. Compl. ¶ 32. In return, Treasury received a million shares of senior preferred stock in the Companies and warrants entitling it to purchase up to 79.9 percent of the Companies' common stock at a nominal price. Am. Compl. ¶¶ 34-35. By operation of law, Treasury's right to purchase common stock in the Companies expired on December 31, 2009. Am. Compl. ¶ 30.

Treasury's preferred stock has a liquidation preference of $1 billion, which increases by one dollar for every dollar the Companies draw on Treasury's funding commitment. Am. Compl. ¶ 35. In the event of liquidation, Treasury will be entitled to recover the full amount of its preference before any other stockholder receives payment.

Am. Compl. ¶ 35.  Treasury is also entitled to receive dividends, which, under the

original PSPAs, the Companies could elect to pay by increasing the amount of the

liquidation preference.  Am. Compl. ¶¶ 36-37.

The PSPAs have been amended several times.  In May 2009, the parties doubled

Treasury's funding commitment from $100 billion to $200 billion.  Am. Compl. ¶ 41.  In

December 2009, the parties increased the funding commitment even more, establishing

a formula that permits Treasury's funding commitment to exceed $200 billion.  Am.

Compl. ¶ 41.  Finally, in August 2012, the parties entered into the Third Amendment,

which is the focus of this litigation.  Am. Compl. ¶ 55.

The Third Amendment replaced the fixed-rate annual dividend to which

Treasury was entitled—and which could be paid by increasing Treasury's liquidation

preference rather than with cash—with a quarterly cash dividend equal to the amount

by which the Companies' net worth exceeds zero, less a capital buffer that decreases

over time (and reaches zero in 2018).  Am. Compl. ¶ 55.  Plaintiffs refer to this dividend

requirement as the "Net Worth Sweep."  Am. Compl. ¶ 55.

The conservatorship in general and the Third Amendment in particular are

bitterly opposed by plaintiffs and other shareholders participating in the second wave

of legal attacks designed to undo the Third Amendment.  According to plaintiffs, the

conservatorship and the Third Amendment were parts of a nefarious plot to seize

control of Fannie and Freddie and operate them for the exclusive benefit of the federal government. Am. Compl. ¶ 28. Plaintiffs claim that Fannie and Freddie did not need the hundreds of billions of dollars of financing that Treasury provided to the Companies during the Great Recession. To the contrary, plaintiffs claim, the Companies were always in a strong financial position and could have weathered the Great Recession by raising additional capital through the financial markets. Am. Compl. ¶¶ 25-29. Plaintiffs' assertion that Fannie and Freddie could have remained solvent without the help of the federal government is dubious, *see, e.g.*, *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 598-602 (D.C. Cir. 2017), *pets. for cert. denied*, 138 S. Ct. 978 (2018) (Nos. 17-578, 17-580, 17-591), but the Court is required to treat it as true at this stage of the litigation.

Plaintiffs filed this action in June 2017 against FHFA, its director Melvin Watt, and Treasury.[1] In their first amended complaint, plaintiffs assert five claims: (1) that FHFA's single-director leadership structure is unconstitutional; (2) that, even if the single-director structure is itself constitutional, it is unconstitutional when combined with other features insulating FHFA from congressional and judicial review; (3) acting director Edward DeMarco's tenure was unconstitutionally long; (4) FHFA's conservatorship powers violate the non-delegation doctrine; and (5) in the alternative, if

_____

[1]Plaintiffs bring only official-capacity claims against Watt. Where applicable, the Court's references to FHFA should be understood to include Watt.

FHFA acts in a private capacity as conservator, then its powers violate the private non-delegation doctrine. The goal of all of these attacks is bringing about the demise of the Third Amendment.

## II. ANALYSIS

### A. Standard of Review

FHFA moves to dismiss Counts I and II of plaintiffs' first amended complaint for lack of jurisdiction and, alternatively, for failure to state a claim. FHFA also moves to dismiss Counts III, IV, and V for failure to state a claim. Treasury moves to dismiss all counts for failure to state a claim.

In reviewing a motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1), a court must first determine whether the movant is making a "facial" attack or a "factual" attack. *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015). In analyzing a facial attack, the Court "restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citation omitted). As FHFA did not submit any materials outside of the complaint in support of its motion, the agency appears to be mounting a facial attack on the Court's jurisdiction. The Court therefore proceeds as it would under Fed. R. Civ. P. 12(b)(6).

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d). But the court may consider materials that are necessarily embraced by the complaint as well as any exhibits attached to the complaint without converting the motion into one for summary judgment. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003). In this case, plaintiffs and Treasury have submitted materials outside of the pleadings. The Court has considered the PSPAs because they are embraced by the complaint, but it has not considered any other materials submitted by the parties and therefore need not convert defendants' motions into motions for summary judgment.

## B. Counts I and II: Separation of Powers

In Count I, plaintiffs allege that the structure of FHFA—that is, an independent agency with a single director removable only for cause—violates the President's constitutional removal authority. In Count II, plaintiffs allege that, even if the single-director structure is itself constitutional, that structure in combination with other features of FHFA violates the principle of separation of powers. Plaintiffs argue that the appropriate remedy for these violations is to vacate the Third Amendment and invalidate those provisions of HERA that make FHFA independent from the President (and, with respect to Count II, independent from the legislative and judicial branches as well). Defendants respond that (1) plaintiffs lack standing to bring these claims and (2) even if plaintiffs had standing, these claims fail on the merits.

### 1. Standing

Standing is a jurisdictional requirement "rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* Plaintiffs bear the burden of establishing standing. *Id.*

At the heart of the claims made by plaintiffs in Counts I and II is their contention that the President lacks sufficient control over FHFA and, as a result, the agency is too

independent.  The injury that plaintiffs allege is the Third Amendment, which purportedly harms their interests as shareholders in the Companies by being too favorable to Treasury.  To remedy this injury, plaintiffs ask the Court to vacate the Third Amendment and strike down the director's tenure protection—and, if necessary, any other provisions that unconstitutionally insulate FHFA from oversight— so that a less independent FHFA (that is, an FHFA under more presidential control) may reconsider its decision to enter into the Third Amendment.

The problem with plaintiffs' claims is glaring:  There is no causal connection between their injury—a Third Amendment that (in plaintiffs' view) is too favorable to the Executive Branch—and the lack of Executive Branch influence over FHFA.  Nor is there any reason to believe that increasing Executive Branch influence over FHFA will somehow result in a "revised" Third Amendment that is less favorable to the Executive Branch.

The Third Amendment is part of a contract between FHFA and Treasury. Treasury is an executive department that is fully under the President's control.  Thus, in a very real sense, the President has already approved the Third Amendment.  Plaintiffs have no coherent theory for how their injury—a Third Amendment that, in plaintiffs' view, is unduly favorable to the President—could have resulted from the President having too *little* control over FHFA.  Nor do plaintiffs have a coherent theory as to why

giving the President *more* control of FHFA will lead to him renegotiating the Third

Amendment so that it is less favorable to himself.  It simply makes no sense to argue

that the Third Amendment is "fairly traceable" to the lack of presidential control or that

increasing presidential control will cause FHFA to reject the Third Amendment.[2]

(Notably, nothing would prevent the President from undoing the Third Amendment

*right now* by directing Treasury to decline to accept the quarterly dividend payments or

to negotiate a deal that is more favorable to FHFA.)  For these reasons, plaintiffs cannot

show either causation or redressability and therefore cannot establish standing.

Plaintiffs respond by arguing that mere speculation about what decision the

government might have reached in the absence of the alleged constitutional violation

cannot defeat standing.  *See, e.g., Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,

561 U.S. 477, 512 n.12 (2010) ("We cannot assume, however, that the Chairman would

have made the same appointments acting alone; and petitioners' standing does not

require precise proof of what the Board's policies might have been in that

counterfactual world.").  In *Free Enterprise Fund*, however, the plaintiff was seeking to

enjoin the agency's investigation into its accounting practices.  *Id.* at 487.  In those

circumstances, it would be impossible for a plaintiff to prove a causal connection

---

[2]Even this scenario assumes that vacatur of the Third Amendment is an
appropriate remedy, which, as discussed below, is an extremely problematic
assumption.

between, one the one hand, the alleged separation-of-powers violation and, on the other hand, the complex decisionmaking process that resulted in the plaintiff becoming the subject of a formal agency investigation. Similarly, in cases involving adjudicatory proceedings, the Supreme Court does not require a plaintiff to prove a causal connection between the alleged separation-of-powers violation and the result of the proceeding. *See Landry v. FDIC*, 204 F.3d 1125, 1130-31 (D.C. Cir. 2000) (collecting cases).

This case is distinguishable. Unlike cases such as *Free Enterprise Fund* and *Landry* in which it was simply impossible to know whether an alleged constitutional error caused any injury, here there is no doubt that the alleged constitutional violation (too little presidential control over FHFA) did *not* cause the alleged injury (an FHFA action that was too favorable to the President). Plaintiffs therefore lack standing to pursue their separation-of-powers claims.[3]

---

[3]Defendants also argue that plaintiffs cannot show causation because the Third Amendment was approved by FHFA during the time that the agency was headed by DeMarco—who, as acting director, allegedly did not enjoy tenure protection. Because the Court concludes that plaintiffs lack standing and that plaintiffs would lose on the merits even if DeMarco was protected from termination without cause, the Court need not address this issue.

-14-

2.  Merits

Even if plaintiffs had standing to assert these claims, the Court would reject the

claims on the merits.  The Supreme Court long ago held that it is constitutionally

permissible for at least some officials in the Executive Branch to be protected from

termination except for cause.  *See Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935)

(rejecting separation-of-powers attack on tenure protections for Federal Trade

Commissioners); *Morrison v. Olson*, 487 U.S. 654 (1988) (rejecting separation-of-powers

attack on tenure protections for independent counsel).

Plaintiffs do not dispute that the directorship of FHFA is the type of executive

office that may constitutionally carry tenure protections under *Humphrey's Executor* and

*Morrison*.[4]  Instead, they argue that the FHFA director's tenure protection, combined

with other features of the agency, unconstitutionally shields the director from oversight.

In particular, they focus on the fact that FHFA is headed by a single director.  Plaintiffs

concede that it may be permissible to grant tenure protection to multimember

commissions, but plaintiffs argue that granting such protection to a single director who

heads an entire agency concentrates too much power in the hands of one individual.

---

[4]To preserve their rights, plaintiffs raise the argument that *Humphrey's Executor* and *Morrison* should be overruled.  Recognizing that this Court does not have the power to overrule those decisions, however, they do not seek a ruling on that basis.

Plaintiffs rely heavily on *PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016)

("*PHH I*"), in which a divided panel of the D.C. Circuit held that tenure protection for

the single head of the Consumer Financial Protection Bureau ("CFPB") violated the

constitutional principle of separation of powers.  After an en banc rehearing, however,

the D.C. Circuit vacated the panel decision, rejected the plaintiffs' separation-of-powers

claim, and affirmed the constitutionality of the CFPB's structure.  *See PHH Corp. v.

CFPB*, 881 F.3d 75 (D.C. Cir. 2018) (en banc) ("*PHH II*").

The Court agrees with the en banc D.C. Circuit's thorough opinion and finds the

panel's opinion unpersuasive.  The core of the panel's reasoning can be summarized as

follows:  The purpose of separation of powers is to protect individual liberty; good

decisions protect individual liberty more than bad decisions; multimember

commissions are more likely to make good decisions than single agency heads;

therefore, multimember commissions are constitutionally permissible, but single agency

heads are not.  The panel opinion also relies heavily on the notion that the individual

members of a multimember body are accountable to each other—which, according to

the panel, more-or-less substitutes for their lack of accountability to the President.

One problem with this reasoning is that it is based on a series of debatable

assumptions about the advantages and disadvantages of various organizational

structures.  *See PHH II*, 881 F.3d at 101 ("PHH's disputed factual premises about the

effects of agency design choices underscore that, while such considerations may be useful fodder for policymaking by Congress, they are not grounds for courts to reshape the constitutional removal power."). For example, whether the quality of decisionmaking increases with the number of decisionmakers is a highly debatable issue with respect to which judges enjoy no special expertise. But even if all of the assumptions underlying the panel opinion are valid, this "unmoored liberty analysis is no part of the inquiry the Supreme Court's cases require[.]" *Id.* at 106.

The Court is also not persuaded that multimember commissions are constitutionally permissible because the members' accountability to each other somehow substitutes for accountability to the President. Putting aside the question of whether commission members are truly accountable to each other, courts are not called upon to reason from first principles to determine which institutional structures will best protect individual liberty. The Framers have already made that choice: the constitutional principle of separation of powers and, within that framework, accountability to the President through the removal power. *Cf. Crawford v. Washington*, 541 U.S. 36, 61 (2004) ("[T]he [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination."). Within that constitutional

structure, the Court's task is to determine "whether a challenged restriction [on the removal power] either aggrandizes the power of another branch or impermissibly interferes with the duty and authority of the President to execute the laws." *PHH II*, 881 F.3d at 106.

Under this standard, longstanding precedent makes clear that the FHFA director is not unconstitutionally insulated from the President. The director can be removed by the President "for cause," 12 U.S.C. § 4512(b)(2), and the Supreme Court has repeatedly held that for-cause removal provides the President with "ample authority to assure that the [officer] is competently performing his or her statutory responsibilities . . . ." *Morrison*, 487 U.S. at 692. The Supreme Court has never cited the fact that an agency had multiple leaders as a reason for finding the agency's structure constitutional. Nor is there is any reason to believe that a single director is less accountable to the President than a multimember body. The President has the exact same power of removal over the single director that he would have over individual members of a multimember commission. Indeed, it may well be easier for the President to hold a single director accountable. When a single person is in charge, there is no doubt about who is responsible for any official action that would justify removal for cause.

True, the FHFA director is appointed for a term of five years, which means that a President who serves only one term could theoretically be deprived of the opportunity

to appoint a director.  But that fact does not distinguish this case from *PHH II*—or, for that matter, from *Morrison*, a case involving a single independent counsel appointed to exercise core executive power for an indefinite amount of time.  *See PHH II*, 881 F.3d at 99 ("None of the leaders of independent financial-regulatory agencies serves a term that perfectly coincides with that of the President, and many have longer terms than [the five-year term of] the CFPB Director.").  In fact, one court has observed that, on balance, this single-director structure may actually permit more presidential control over the agency's direction than would a multimember commission.  *See CFPB v. Navient Corp.*, No. 3:17-CV-101, 2017 WL 3380530, at *17 (M.D. Pa. Aug. 4, 2017) (explaining that 80 percent of presidential terms will permit the appointment of a CFPB director, whereas only 57 percent of presidential terms will permit a president to appoint a controlling majority of the Federal Trade Commission).

More fundamentally, an individual President's ability to control the agency through the *appointment* power is not what is critical.  Instead, what is critical is whether, through the *removal* power, the President retains a constitutionally acceptable level of control over a director who has already been appointed.  Under *Humphrey's Executor* and *Morrison*, the answer to that question is "yes."

Plaintiffs also point to the fact that FHFA is funded outside of the normal appropriations process, thus insulating the agency from congressional oversight.  To the

extent that plaintiffs contend that congressional oversight is necessary to correct what they view as an unconstitutional limit on the President's removal power, their argument is misplaced. Again, the question is whether the President retains sufficient oversight; congressional oversight cannot substitute for executive oversight and indeed can itself impermissibly intrude on the Executive Branch. *See Bowsher v. Synar*, 478 U.S. 714, 720 (1986) ("Under the separation of powers established by the Framers of the Constitution . . . Congress may not retain the power of removal over an officer performing executive functions."); *see also Free Enter. Fund*, 561 U.S. at 499-500 (rejecting the argument that such "bureaucratic minutiae" as control over the agency's budget and funding is relevant to the constitutionality of limits on the presidential removal power). Moreover, Congress's choice to limit its own budgetary oversight does not violate the principle of separation of powers: "Congress itself may choose . . . to loosen its own reins on public expenditure. . . . [And] Congress may also decide not to finance a federal entity with appropriations . . . ." *Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. Fed. Labor Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004); *see also Navient Corp.*, 2017 WL 3380530, at *16 (noting that Congress "remains free to change how the Bureau is funded at any time" and that "at least five other independent agencies . . . operate completely outside of the normal annual appropriations process").

Finally, plaintiffs point out that HERA limits judicial review of FHFA's actions. In the Court's view, this too is not a particularly relevant consideration in the context of a separation-of-powers challenge. Even if it were, judicial review of FHFA decisionmaking is not so limited as to create a constitutional problem. The most severe restrictions cited by plaintiffs all relate to actions taken by FHFA when acting as a conservator or receiver. *See* Am. Compl. ¶ 86 (citing statutes). Outside of that context, the regulatory actions of FHFA, like the regulatory actions of most agencies, are generally reviewable under the Administrative Procedure Act. *See* 12 U.S.C. § 4634; *see also* 12 U.S.C. § 4623(a), (b) (permitting judicial review of challenges to certain FHFA actions on the grounds that they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with applicable laws").

For all of these reasons, the Court concludes that, even if plaintiffs had standing to pursue the claims made in Counts I and II of their amended complaint, those claims would fail on the merits.

## C. Count III: Appointments Clause

The parties agree that the FHFA director is a principal officer of the United States who must be nominated by the President and confirmed by the Senate. *See* U.S. Const. art. II, § 2, cl. 2; 12 U.S.C. § 4512(b)(1). As described above, after the first FHFA director

resigned, President Obama designated deputy director Edward DeMarco to serve as acting director pursuant to 12 U.S.C. § 4512(b)(5).

Plaintiffs do not dispute that subordinate officers who have not been confirmed by the Senate may discharge the duties of a principal officer for a limited time. *See United States v. Eaton*, 169 U.S. 331, 343-44 (1898) (rejecting claim that vice consul, who was charged with performing the duties of the consul in the consul's absence, was unconstitutionally appointed because he was not confirmed by the Senate). But plaintiffs allege that DeMarco's tenure, which lasted over four years, was unconstitutionally long. According to plaintiffs, the Constitution demands that the length of an acting officer's tenure must be reasonable under the circumstances, but never more than two years. *See id.* at 343 (noting that vice consuls perform the consul's duties "for a limited time, and under special and temporary conditions").

## 1. Justiciability

The Court agrees with FHFA that determining whether an otherwise validly appointed acting officer has served for "too long" is a non-justiciable political question. The Supreme Court has identified several circumstances in which a dispute will be found non-justiciable, including where there is "a lack of judicially discoverable and manageable standards for resolving it" and where it is not possible to resolve the dispute "without an initial policy determination of a kind clearly for nonjudicial

discretion[.]" *Baker v. Carr*, 369 U.S. 186, 217 (1962).  Both of these concerns are implicated here.

Again, the premise of plaintiffs' challenge is that a judge should determine whether an acting director has served for an unreasonably long time.  Plaintiffs compare their challenge to challenges to the validity of an officer's appointment, which courts are capable of adjudicating.  But challenges to the validity of an officer's appointment are ripe at the moment of appointment—before the officer has taken any official action.  Plaintiffs' claim is quite different.  The logic of their constitutional claim is that DeMarco's initial appointment was valid, and that the actions that he took early in his term were valid.[5]  But at some point, say plaintiffs, DeMarco's tenure became unreasonably long, and the actions that he took after that point were invalid.  To support their argument, plaintiffs cite opinions of the Office of Legal Counsel stating that an acting officer should serve only "as long as is reasonable under the circumstances," *Designation of Acting Director of the Office of Management and Budget*, 2003 WL 24151770, at *1 n.2 (O.L.C. June 12, 2003), and proposing a multifactor test to determine reasonableness, including "the President's ability to devote attention to the matter" and whether the President has "a desire to appraise the work of an Acting

---

[5]In their briefing, plaintiffs attempt to raise a new, statutory challenge to DeMarco's appointment, which the Court discusses below.

Director," *Status of the Acting Director, Office of Management and Budget*, 1 Op. O.L.C. 287,

290 (1977).

The OLC opinions on which plaintiffs rely illustrate why the "reasonable under

the circumstances" test is not a judicially discoverable or manageable standard.

Applying that standard would require a judge to assess the functioning of the entire

Executive Branch and the changing state of the nation (actually, the world) throughout

the length of the acting officer's tenure to determine at what point, if ever, the length of

the officer's service became unreasonable. These assessments are far outside the

competency of the judiciary and would require delving into areas—such as "the

President's ability to devote attention to the matter" and his "desire to appraise the

work of an Acting Director"—that are not normally the subject of judicial inquiry.

Moreover, these assessments would involve "initial policy determination[s] of a kind

clearly for nonjudicial discretion."

Critically, these assessments can only be done retrospectively, which would

throw the functioning of the government into intolerable uncertainty. Because the

conditions under which an acting officer serves are continually changing, it would be

impossible to know, in advance, how long those conditions would justify an acting

officer's continued service. Nor would it even be possible—as conditions fluctuate from

day to day, week to week, month to month—to contemporaneously identify the

moment at which the acting officer's tenure became too long. The passage of yet more time would be necessary to put those changes in perspective.

As a result, none of those who had business before or were being affected by the agency—not private individuals, not businesses, not other governmental agencies, not members of Congress, not even the President himself—would have any way of knowing whether the acting officer who was heading the agency had lost his or her authority to act on the agency's behalf. Instead, they would have to order their affairs with the knowledge that, at some point years later, a judge acting with the benefit of hindsight might pronounce the length of the tenure unreasonable and pick an essentially arbitrary point beyond which the officer's actions will be deemed invalid. This is no way to run a government. *Cf. Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality opinion) (addressing justiciability and explaining that, while "[l]aws promulgated by the Legislative Branch can be inconsistent, illogical, and ad hoc . . . law pronounced by the courts must be principled, rational, and based upon reasoned distinctions").

The facts of this case illustrate the problem. As described above, the first FHFA director resigned in August 2009, thereby triggering the designation of DeMarco as acting director. At that point, Fannie and Freddie had been under conservatorship for nearly a year and Treasury's funding commitment had recently doubled from

$100 billion to $200 billion.  Just over a year after DeMarco's appointment, President Obama sent a nomination to the Senate, but the Senate failed to act and the nomination was returned to the President on December 22, 2010.  Am. Compl. ¶ 44.  In May 2013, President Obama made another nomination, which stalled in the Senate for more than seven months until the Senate finally voted to confirm on December 10, 2013.  Am. Compl. ¶ 44.

Plaintiffs allege that, by the time that the Third Amendment was adopted in August 2012, DeMarco's tenure had become unreasonable.  But consider the circumstances facing FHFA in August 2012:  The agency was charged with administering "the largest conservatorships in U.S. history," Am. Compl. ¶ 19, over two companies that dominated the housing market—the recent collapse of which had triggered the most serious economic crisis since the Great Depression.  Those companies were also the beneficiaries of hundreds of billions of dollars in governmental financing.  Whether at that point no acting director was needed is the type of judgment call that the judiciary is not equipped to make.  Nor is the judiciary equipped to litigate the question whether the President had the ability to devote attention to the matter between December 2010 and May 2013.  Indeed, it is difficult to imagine what such litigation would look like or how the normal tools of discovery would operate.  ("Mr. President, I see that you spent two hours meeting with the ambassador from Aruba on

March 23.  Wasn't it more important for you to devote attention to the affairs of the FHFA?")

Plaintiffs point to other timing-based constitutional challenges, contending that such challenges are capable of adjudication.  But the cases to which they point are distinguishable.  For example, in *NLRB v. Noel Canning*, the Court held that a break of less than ten days is presumptively too short to fall within the meaning of "recess" in the Recess Appointments Clause.  134 S. Ct. 2550, 2566-67 (2014).  Unlike the reasonableness of DeMarco's tenure, however, the meaning of "recess" is a static question of law that is capable of prospective determination.[6]

Plaintiffs also cite *Morrison* and *Edmond v. United States*, 520 U.S. 651 (1997), for the proposition that courts consider the length of an officer's tenure as a factor in determining whether the officer is principal or inferior.  But neither of those cases involved a retrospective consideration of a particular officer's tenure in light of the conditions under which he served; instead, they prospectively considered the length of

_____

[6]It is true that the Supreme Court "[left] open the possibility that some very unusual circumstance—a national catastrophe, for instance, that renders the Senate unavailable but calls for an urgent response—could demand the exercise of the recess-appointment power during a shorter break."  *Noel Canning*, 134 S. Ct. at 2567.  Such drastic conditions are not necessary for the appointment of an acting officer, however.  *Cf. Eaton*, 169 U.S. at 331-33 (describing circumstances under which Eaton and his successor vice consul performed the duties of the consul).  Moreover, the question whether an event is sufficiently catastrophic to permit a recess appointment during a shorter break arises, and can be resolved, at the time of the appointment.

time generally permitted by statute for the office. Moreover, neither of the cases actually placed much significance on the length of the officer's tenure. *Morrison* found that the independent counsel was an inferior officer despite the fact that an independent counsel serves for an indefinite time. *Morrison*, 487 U.S. at 671. As *Edmond* explained, *Morrison* characterized the independent counsel's office as "limited in tenure" to denote, not a particular length of time, but rather an "appoint[ment] essentially to accomplish a single task [at the end of which] the office is terminated." *Edmond*, 520 U.S. at 661 (quoting *Morrison*, 487 U.S. at 672; alterations in original). And in *Edmond* itself, the Court essentially treated any temporal factor as irrelevant, finding that the officers in question were inferior despite the fact that they were *not* "limited in tenure" as that phrase was used in *Morrison*. *Id.* at 661, 666. Neither of these cases indicate that a court should engage in a freewheeling, after-the-fact assessment of the reasonableness of a particular officer's tenure.

It is true that, in *Eaton*, the Supreme Court explained that the vice consul could constitutionally exercise the duties of the consul in part because the vice counsel was "charged with the performance . . . for a limited time, and under special and temporary conditions . . . ." *Eaton*, 169 U.S. at 343. But this was simply a general description of the circumstances under which a vice consul is authorized to perform the duties of a consul, not a comment on the length of the particular vice consul's tenure in that case or

the conditions under which he served. Indeed, Eaton (the vice consul who performed the consul's duties for nearly a year) was himself succeeded by another vice consul. *Id.* at 332-33. The Supreme Court seemed untroubled by that fact; it did not even mention the total length of time during which there was no Senate-confirmed consul, much less discuss the length of Eaton's tenure in its analysis or explain why the length of his tenure was constitutionally permissible. In short, the Supreme Court was not asked to decide—and did not decide—how long an inferior officer may perform the duties of a principal officer. *Eaton* is not at odds with the Court's conclusion that plaintiffs' "reasonableness" standard is non-justiciable.

Plaintiffs seek to get around the justiciability problem by proposing a ceiling of two years on any acting officer's tenure. They point out that this is the maximum possible term for an officer appointed under the Recess Appointments Clause and argue that it would be anomalous for the President to be able to evade this limit through the appointment of acting officers.

The problem for plaintiffs is that recess appointees are not analogous to acting officers. When making a recess appointment, the President has unlimited authority; he can appoint anyone of his choosing with no oversight whatsoever. This power extends even beyond the Executive Branch to include Article III judgeships. *See Evans v.*

*Stephens*, 387 F.3d 1220, 1222-24 (11th Cir. 2004).  The *sole* limit on this extraordinary

authority over two of the three branches of government is temporal.

The same cannot be said of acting officers.  Congress has the power to control the

President's choice of acting officers—which, by their very nature, are limited to the

Executive Branch.  *See, e.g.*, 5 U.S.C. § 3345 (Vacancies Reform Act provision limiting

who may be appointed as acting director of an executive agency).  In this case, for

example, the President's choice was severely circumscribed:  He was required to choose

an acting director from among FHFA's three deputy directors.  12 U.S.C. § 4512(f).  This

is simply not comparable to the ability of a President to make a recess appointment with

no restrictions or oversight whatsoever.

Importantly, if Congress perceives that the President is abusing his limited

power to appoint acting officers, Congress has the ability to address the problem

through legislation.  But Congress cannot limit the President's constitutionally granted

power under the Recess Appointments Clause.  The unlimited constitutional power to

make recess appointments is therefore unlike the limited statutory power to designate

acting officers.  And given the vastly different types, functions, and tenures of executive

officers, the Court could not possibly say that a two-year limit on acting officers' tenure

is mandated in each and every case—which is what the Court would have to say in

order to avoid the justiciability problem discussed above.

Because plaintiffs' proposed "reasonableness" standard is not capable of judicial application—and because plaintiffs' two-year cap finds no support in the Constitution—the Court rejects plaintiffs' claim that the length of DeMarco's tenure was constitutionally invalid.

### 2. Other Appointments Clause Challenges

In addition to their challenge to the length of DeMarco's term, plaintiffs make two other arguments regarding the validity of his tenure. First, they argue that, although it is permissible for the duties of a principal officer to temporarily devolve upon a subordinate by operation of law, the President may not be given the power to select the officer who will perform those duties (unless his choice is confirmed by the Senate). As a result, plaintiffs contend, the procedure under § 4512(f) is unconstitutional, as it gives the President the ability to choose an acting director from one of three deputy directors. Plaintiffs base their argument on the fact that the Constitution identifies only one circumstance in which the President may appoint a principal officer without Senate confirmation: during a Senate recess.

Plaintiffs' argument suffers from a logical flaw, however. As explained in *Eaton*, a subordinate who takes on the duties of a principal officer does not thereby become a principal officer who requires Senate confirmation. *Eaton*, 169 U.S. at 343-44. Given that the Appointments Clause permits Congress to vest the appointment of inferior

officers in the President alone, there is nothing unconstitutional about allowing the President to choose an acting director.

Second, plaintiffs contend that, setting aside any constitutional problems with DeMarco's appointment and tenure, his appointment did not comply with § 4512(f). Their argument is as follows: DeMarco's predecessor, James Lockhart, served as FHFA director pursuant to § 4512(b)(5). That provision designated the then-current director of OFHEO (FHFA's predecessor) to "act" as the first FHFA director. As a result, plaintiffs argue, Lockhart merely served as an *acting director*, and his resignation therefore did not trigger § 4512(f)—which applies only "[i]n the event of the death, resignation, sickness, or absence of *the Director* . . . ." (Emphasis added.)

Plaintiffs did not assert this claim in their amended complaint, and therefore it is not properly before the Court.[7] *See Fischer v. Minneapolis Pub. Schs.*, 792 F.3d 985, 990 n.4 (8th Cir. 2015) ("'[I]t is axiomatic that [a] complaint may not be amended by the briefs in opposition to a motion to dismiss.'" (citation and quotations omitted; alterations in original)); *Thomas v. United Steelworkers Local 1938*, 743 F.3d 1134, 1140 (8th Cir. 2014) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy." (citation and quotations omitted)); *Gallagher v. City of Clayton*, 699 F.3d 1013, 1022 (8th Cir. 2012) ("It is a basic principle that the complaint may not be

[7]As DeMarco was appointed in 2009, it is also likely that any challenge to the validity of that appointment would be time-barred. *See* 28 U.S.C. § 2401(a).

amended by the briefs in opposition to a motion to dismiss, nor can it be amended by the briefs on appeal." (citation and quotations omitted)).

In any event, the Court disagrees with plaintiffs' reading of the statute. Although the language of § 4512(b)(5) can be read to suggest a distinction between Lockhart's role and the role of a director appointed under § 4512(b)(1), the Court believes that the better reading is that Lockhart was a director whose resignation triggered the power to appoint an acting director under § 4512(f).

Section 4512(b)(5) is the fifth paragraph of subsection (b), which is generally concerned with the appointment of the director. The first four paragraphs of subsection (b) describe the process for appointing a director and govern the length of his tenure. The fifth paragraph, under which Lockhart became the director, begins with the phrase "[n]otwithstanding paragraphs (1) and (2)"—thus indicating that the person designated under (b)(5) *would* be subject to those provisions if not for the excepting language. The structure and language of subsection (b) thus connect the "director" appointed under (b)(5) to the "director" appointed under (b)(1). For that reason, the better reading of the statute is that (b)(5) is not describing some unique official, but rather a director like those described in (b)(1) (albeit appointed under a special method and with a special tenure not applicable to later directors).

This interpretation is further bolstered by the fact that (b)(5) vests the director's duties in the former director of OFHEO.  Because the office of OFHEO director required Senate confirmation, Lockhart could constitutionally serve as the director (and not merely the acting director) of FHFA without additional Senate confirmation.  *See FHFA v. UBS Americas Inc.*, 712 F.3d 136, 144 (2d Cir. 2013) (holding that Lockhart's duties as FHFA director were "germane" to his duties as OFHEO director and therefore he did not need to be renominated and reconfirmed).  And indeed, paragraph (b)(5) states that the appointed individual acts "for *all* purposes as" and "with the *full* powers of" the director.  (Emphasis added.)  This case is therefore unlike *Doolin Security Savings Bank, F.S.B. v. Office of Thrift Supervision,* in which the D.C. Circuit held that the resignation of an acting director who was not appointed in conformity with the Appointments Clause did not trigger a "vacancy" within the meaning of the Vacancies Act.  139 F.3d 203, 207-08 (D.C. Cir. 1998).

Finally, the Court finds it unlikely that Congress intended to leave the office of FHFA director vacant in the event of Lockhart's resignation.  The manifest purpose of § 4512(b)(5) was to enable FHFA to hit the ground running in response to a serious economic crisis.  Any resignation by the agency's first director would likely occur relatively early in the life of the agency.  Congress cannot have intended to leave FHFA rudderless in the midst of the emergency that prompted the agency's creation.  For

these reasons, the Court rejects plaintiffs' argument that DeMarco's appointment was not in conformity with § 4512(f).

### 3. De Facto Officer Doctrine

Even if the Court were to agree with plaintiffs that DeMarco's service as acting director was invalid at the time that FHFA entered into the Third Amendment, the *de facto* officer doctrine would bar the relief that plaintiffs are seeking.

"The *de facto* officer doctrine confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient." *Ryder v. United States*, 515 U.S. 177, 180 (1995). The doctrine "springs from the fear of the chaos that would result from multiple and repetitious suits challenging every action taken by every official whose claim to office could be open to question, and seeks to protect the public by insuring the orderly functioning of the government despite technical defects in title to office." *Id.* (citation and quotations omitted).

Plaintiffs argue that the *de facto* officer doctrine only applies to technical defects in the appointment process, not to alleged violations of the Appointments Clause. Several Supreme Court cases contain language supporting this view. *See Nguyen v. United States*, 539 U.S. 69, 77 (2003) ("Typically, we have found a judge's actions to be valid *de facto* when there is a merely technical defect of statutory authority." (citations

and quotations omitted)); *Ryder*, 515 U.S. at 182 (declining to apply the *de facto* officer

doctrine because "one who makes a timely challenge to the constitutional validity of the

appointment of an officer who adjudicates his case is entitled to a decision on the merits

of the question"); *McDowell v. United States*, 159 U.S. 596, 598 (1895) (rejecting challenge

to a judge that involved "a mere matter of statutory construction" rather than a

"trespass upon the executive power of appointment").

All of these cases, however, arose in a specific context:  They involved challenges

by litigants to the power of the judicial officers who were presiding over their cases.

This context is significant for two reasons.  First, the disruption caused by invalidating a

judgment on the basis of the invalidity of the judicial officer's appointment is no

different from the disruption caused by overturning a judgment for any other reason.

The overturning of a lower-court judgment is a routine outcome of judicial review; it is

generally not a big deal.  Consequently, the concerns animating the *de facto* officer

doctrine—such as finality and "insuring the orderly functioning of the government,"

*Ryder*, 515 U.S. at 180—have little application in this context.

Second, the litigants in these cases raised their challenges to the authority of the

judicial officers during the course of litigation, which suggests that there was a natural

end point beyond which their challenges would no longer have been entertained—

namely, after the judgments became final.[8]  *See id.* at 182 (stating that a "*timely* challenge to the constitutional validity of the appointment of an officer who adjudicates his case" should be entertained on the merits (emphasis added)).  Likely for these reasons, the Supreme Court has hinted that these limits on the *de facto* officer doctrine only apply in challenges to judicial appointments:  "Whatever the force of the *de facto* officer doctrine in other circumstances, an examination of our precedents concerning alleged irregularities in the assignment of judges does not compel us to apply it in these [judicial] cases."  *Nguyen*, 539 U.S. at 77.

In other contexts, the Supreme Court has been willing to employ the *de facto* officer doctrine to avoid invalidating the actions of officials, even when the officials' authority is challenged on constitutional grounds.[9]  For example, in *Buckley v. Valeo*, the

---

[8]Compare, for example, *United States v. Booker*, in which the Supreme Court held that the mandatory Sentencing Guidelines violated the Sixth Amendment right to a jury trial.  543 U.S. 220 (2005).  The constitutional significance of the right to a jury trial in criminal cases can hardly be overstated.  Yet the Supreme Court only applied its holding to cases that were still pending on direct review, *id.* at 268, meaning that nearly two decades' worth of criminal sentences imposed under an unconstitutional regime were left intact.  In other words, there are circumstances in which counterbalancing concerns of finality and the orderly functioning of government outweigh the injustice of failing to redress a constitutional injury—even an injury as palpable as being deprived of the right to have a jury find, beyond a reasonable doubt, all facts used to increase a criminal sentence.  The Court sees no reason why Appointments Clause violations would be exempt from this general principle.

[9]It is true that courts will in some cases invalidate the actions of executive officials whose appointments violated the Appointments Clause.  *See, e.g.*, *Lucia v. S.E.C.*, No. 17-130, 2018 WL 3057893, at *8-9 (U.S. June 21, 2018) (holding that

Supreme Court recognized the "de facto validity" of the Federal Election Commission's past actions despite finding that four of the members' appointments violated the Appointments Clause. 424 U.S. 1, 142 (1976). Plaintiffs point out that *Ryder* confined *Buckley* to its facts. *See Ryder*, 515 U.S. at 184 ("To the extent these civil cases [*Buckley* and *Connor v. Williams*, 404 U.S. 549 (1972) (per curiam)] may be thought to have implicitly applied a form of the *de facto* officer doctrine, we are not inclined to extend them beyond their facts."). But, as relevant to the Appointments Clause challenge, the facts of *Buckley*—which concerned the activities of an executive agency with a wide range of regulatory responsibilities—are much more similar to the facts of this case than they are to the facts of *Ryder* and *Nguyen*.

Plaintiffs also contend that *Buckley* did not really apply the *de facto* officer doctrine, but instead applied the later-discredited non-retroactivity doctrine of *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971). But *Buckley* did not cite *Chevron Oil*, despite the fact that *Chevron Oil* had been decided only five years earlier. Instead, *Buckley* cited, among other cases, *Ryan v. Tinsley*, 316 F.2d 430, 431-32 (10th Cir. 1963), which explicitly relied on the *de facto* officer doctrine. *See also Ryder*, 515 U.S. at 183-84 (declining to apply the

administrative law judge was unconstitutionally appointed and remanding the case for a hearing before a different, properly appointed judge); *Noel Canning*, 134 S. Ct. at 2558, 2578 (affirming the lower court's invalidation of an order from the National Labor Relations Board). But such cases typically involve contested adversarial proceedings and thus more closely resemble cases like *Ryder* and *Nguyen*.

*de facto* officer doctrine and then separately analyzing the government's "alternative[]" argument under *Chevron Oil*).

The Court therefore sees no barrier to the application of the *de facto* officer doctrine in this case, which stands on a completely different footing from *Ryder* and *Nguyen*. Here, plaintiffs are attempting to unwind the actions of an executive agency going back more than five years—actions of national (indeed, international) significance that have been the basis of trillions of dollars' worth of economic activity. There is simply no way to put the parties back into the positions they occupied in August 2012. And plaintiffs' particular challenge to the validity of the Third Amendment—first brought in June 2017—can by no stretch be considered "timely." *See Ryder*, 515 U.S. at 182 (the challenge must be "timely").

Plaintiffs argue that they brought their claim within the applicable statute of limitations. *See* 28 U.S.C. § 2401(a). But that was undoubtedly true in *Buckley* as well. The private interests served by statutes of limitation cannot be compared to the fundamental need for a stable, functioning government. The Court therefore holds that, even if DeMarco's initial appointment or length of service violated the Appointments Clause, the *de facto* officer doctrine would bar plaintiffs' attempt to undo the Third Amendment.

*D. Counts IV and V: Non-Delegation Doctrine*

Finally, plaintiffs allege that Congress's grant of conservatorship powers to FHFA violates the non-delegation doctrine.

The Court agrees with FHFA that the non-delegation doctrine is not implicated in this case, because FHFA was not exercising governmental power when it agreed to the Third Amendment. *See Herron v. Fannie Mae*, 861 F.3d 160, 169 (D.C. Cir. 2017) (stating that, as conservator, FHFA "step[ped] into Fannie Mae's private shoes," "shed[] its government character," and "[became] a private party" (citation and quotations omitted; some alterations in original)); *U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1261 (9th Cir. 2016) (holding that FHFA's conservatorship over Fannie and Freddie did not transform them into governmental entities because the conservatorship "places FHFA in the shoes of Fannie Mae and Freddie Mac, and gives the FHFA *their* rights and duties, not the other way around"); *see also U.S. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502-03 (3d Cir. 2017) ("We conclude that the [Small Business Administration], when acting as a receiver under the circumstances here, was not acting as the Government."); *United States v. Beszborn*, 21 F.3d 62, 68 (5th Cir. 1994) (rejecting double-jeopardy claim because earlier lawsuit was pursued by the Resolution Trust Corporation "in its private, non-governmental capacity as receiver").[10]

_____

[10]The Eighth Circuit, like all other circuits to have addressed the question, has held that Fannie, Freddie, and FHFA are governmental instrumentalities that Congress

The Third Amendment is simply a contractual arrangement that FHFA entered into on behalf of two private entities—Fannie and Freddie—in its capacity as their conservator.  As other courts have noted, "[r]enegotiating dividend agreements, managing heavy debt and other financial obligations, and ensuring ongoing access to vital yet hard-to-come-by capital are quintessential conservatorship tasks . . . ."  *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 607 (D.C. Cir. 2017), *pets. for cert. denied*, 138 S. Ct. 978 (2018) (Nos. 17-578, 17-580, 17-591).  In other words, these are the types of activities that any conservator would typically undertake, not exercises of governmental power.

Plaintiffs argue that the Third Amendment was nevertheless an exercise of governmental power because, according to plaintiffs, no private conservator or corporate officer could have entered into it without violating fiduciary and other duties normally imposed under state law.  It may well be true that FHFA's actions would not be allowed under traditional principles of corporate or conservatorship law,[11] but it

may exempt from state and local taxation.  *Hennepin Cty. v. Fed. Nat'l Mortg. Ass'n*, 742 F.3d 818, 823-24 (8th Cir. 2014).  But an entity may be considered a governmental entity for one purpose—in particular, for the purpose of being protected from state and local taxes—without being considered a governmental entity for all purposes.  *Aurora Loan Servs.*, 813 F.3d at 1261.

[11]*But see Roberts v. FHFA*, 889 F.3d 397, 404 (7th Cir. 2018) ("While the dividend terms under the Third Amendment may initially have proven more profitable to Treasury than to Fannie and Freddie, a conservator could have believed that the amendment's terms would further the conservation of the companies' assets better than either the ten-percent cash dividend or the twelve-percent increases in liquidation preference.").

does not follow that those actions are therefore governmental.  Legislatures can expand

conservatorship and similar powers without transforming conservators into agents of

the government.  *Cf. Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000) (explaining that the

Employee Retirement Income Security Act altered the common law of trusts to permit

certain actions that would otherwise violate the trustee's fiduciary duties).

Plaintiffs also argue that entering into the Third Amendment altered the legal

rights and obligations of third parties, which, according to plaintiffs, is the very essence

of governmental power.  This is simply not true; corporate contracts commonly alter

shareholders' rights and obligations.  Plaintiffs contend that it is significant that FHFA

is charged with acting in the public interest.  But Fannie and Freddie were themselves

"created . . . to accomplish a number of governmental objectives for the national

housing market," *Herron*, 861 F.3d at 167-68, and yet no one disputes that they are

private entities.

Plaintiffs compare this case to *Slattery v. United States*, in which the Federal

Circuit held that the FDIC, acting as the receiver for a failed bank, was the "United

States" for purposes of the Tucker Act.  583 F.3d 800, 828 (Fed. Cir. 2009).  *Slattery* is

distinguishable, however.  In *Slattery*, the FDIC, acting in its own capacity, contractually

agreed to grant certain regulatory concessions to a healthy bank to induce that bank to

merge with a failing bank.  *Id.* at 804.  The FDIC breached the agreement, causing the

healthy bank to go into a downward spiral that eventually resulted in the FDIC putting it into receivership. *Id.* at 805-07. Among other claims, the shareholder-plaintiffs contended that the FDIC, acting as receiver, wrongfully failed to distribute the liquidation surplus. *Id.* at 826. The Federal Circuit simply held that "the FDIC's position in contracting on behalf of the United States, and its liability for breach, includes responsibility for the consequences of the breach." *Id.* at 828. The FDIC's promise in *Slattery* to forbear enforcing certain regulatory requirements was clearly an exercise of governmental power. In this case, however, FHFA was not exercising governmental power when, as conservator of two private entities, it entered into a contract on those entities' behalf.

Finally, citing *Perry Capital*, plaintiffs contend that FHFA has the "power . . . to suspend the application of provisions of the APA and HERA that would have otherwise restricted Treasury's legal authority to invest in the Companies." Pls.' Mem. in Resp. at 24-25 [ECF No. 43]. This is a mischaracterization of *Perry Capital*, which simply held that the plaintiffs could not circumvent FHFA's statutory protection from judicial review by seeking declaratory and injunctive relief against FHFA's contractual counterparty. *Perry Capital*, 864 F.3d at 615-16.

Anticipating that the Court might find that FHFA acts as a private entity when it acts as conservator of Fannie and Freddie, plaintiffs argue in the alternative that FHFA's

actions violate the private non-delegation doctrine.  Generally speaking, that doctrine limits the government's ability to delegate regulatory and other governmental authority to private parties.  *See Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004) ("Any delegation of regulatory authority 'to private persons whose interests may be and often are adverse to the interests of others in the same business' is disfavored." (quoting *Carter v. Carter Oil Co.*, 298 U.S. 238, 311 (1936)).  The Court has already held, however, that FHFA's actions as a conservator are *not* governmental in nature—and specifically that FHFA did not exercise regulatory or other governmental authority when it agreed to the Third Amendment.  As a result, the private non-delegation doctrine is not implicated.

Finally, even if FHFA is exercising governmental authority when it acts as conservator, there is no non-delegation problem.  "Congress may not constitutionally delegate its legislative power to another branch of Government."  *Touby v. United States*, 500 U.S. 160, 165 (1991).  But this doctrine "does not prevent Congress from seeking assistance, within proper limits, from its coordinate Branches."  *Id.*  "So long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'"  *Id.* (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)) (alterations in original); *see also United States v. Fernandez*, 710

F.3d 847, 849 (8th Cir. 2013) (per curiam) ("So long as Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of the delegated authority, it has provided an intelligible principle." (citation and quotations omitted)).

HERA provides the requisite "intelligible principle." It authorizes the appointment of FHFA as conservator or receiver "for the purpose of reorganizing, rehabilitating, or winding up the affairs of" the Companies. 12 U.S.C. § 4617(a)(2). It further empowers FHFA, as conservator, to conduct the Companies' business and

> take such action as may be—
>
> (i) necessary to put [the Companies] in a sound and solvent condition; and
>
> (ii) appropriate to carry on the business of [the Companies] and preserve and conserve the assets and property of [the Companies].

*Id.* § 4617(b)(2)(D). And HERA specifies various actions that FHFA may take to accomplish these tasks. *Id.* § 4617(b)(2)(B). This is more than sufficient to meet the "intelligible principle" standard. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) ("we have found an 'intelligible principle' in various statutes authorizing regulation in the 'public interest'"); *Fernandez*, 710 F.3d at 849 (noting that the Supreme Court has "upheld delegations when the 'intelligible principle' guiding the administrator was to set 'fair and equitable' prices and when the FCC regulates

broadcast licenses 'as public interest, convenience, or necessity' require" (citations

omitted)).

Plaintiffs argue that the lack of judicial oversight of FHFA's actions as

conservator results in FHFA having too much power. *See United States v. Garfinkel*, 29

F.3d 451, 459 (8th Cir. 1994) ("[J]udicial review is a factor weighing in favor of

upholding a statute against a nondelegation challenge." (citation and quotations

omitted; alterations in original)).  FHFA does not operate without oversight, however.

The agency must submit detailed annual reports to Congress concerning its activities

and the condition of the Companies.  12 U.S.C. § 4521(a).  Given the ongoing nature of a

conservatorship (which demands a degree of flexibility), this continuing supervision is

sufficient to satisfy the requirements of the non-delegation doctrine.  *Cf. Whitman*, 531

U.S. at 475 ("the degree of agency discretion that is acceptable varies according to the

scope of the power congressionally conferred"); *Touby*, 500 U.S. at 168-69 (rejecting a

non-delegation challenge to the DEA's authority to temporarily designate a drug as a

schedule I controlled substance for up to 18 months without pre-enforcement judicial

review).

### E.  Conclusion

Having found no viable claims against FHFA, the Court grants FHFA's motion to

dismiss.  Because there are no viable claims against FHFA, there are likewise no viable

claims against Treasury. Indeed, plaintiffs have failed to explain the basis of any of

their claims against Treasury, and thus have necessarily failed to identify any claim that

could survive the dismissal of the claims against FHFA. The Court therefore also grants

Treasury's motion to dismiss (without needing to address the additional arguments that

Treasury makes in support of its motion).

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.    Defendants' motions to dismiss [ECF Nos. 29, 34] are GRANTED.

2.    Counts I and II of plaintiffs' first amended complaint [ECF No. 27] are

DISMISSED WITHOUT PREJUDICE for lack of jurisdiction.

3.    All of plaintiffs' other claims are DISMISSED WITH PREJUDICE.

4.    Plaintiffs' motion for summary judgment [ECF No. 41] is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.


 Dated:  July 6, 2018                              s/Patrick J. Schiltz_____
                                                   Patrick J. Schiltz
                                                   United States District Judge