UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

ATIF F. BHATTI; TYLER D. WHITNEY;
and MICHAEL F. CARMODY,

              Plaintiffs,

v.

THE FEDERAL HOUSING FINANCE
AGENCY; SANDRA L. THOMPSON, in
her official capacity as Director of the
Federal Housing Finance Agency; THE
DEPARTMENT OF THE TREASURY;
and JANET L. YELLEN, in her official
capacity as Secretary of the Treasury,

              Defendants.

Case No. 17-CV-2185 (PJS/JFD)

ORDER

---

Peter A. Patterson, David H. Thompson, and Brian W. Barnes, COOPER & KIRK,
PLLC; Scott G. Knudson, TAFT STETTINIUS & HOLLISTER LLP, for plaintiffs.

Robert J. Katerberg, Howard N. Cayne, and Asim Varma, ARNOLD & PORTER
KAYE SCHOLER LLP; Mark A. Jacobson, COZEN O'CONNOR, for defendants
Federal Housing Finance Agency and Sandra L. Thompson.

Robert Charles Merritt, UNITED STATES DEPARTMENT OF JUSTICE; Craig R.
Baune, UNITED STATES ATTORNEY'S OFFICE, for defendants Department of
the Treasury and Janet L. Yellen.

Plaintiffs are shareholders in the Federal National Mortgage Association

(commonly known as "Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage

Corporation (commonly known as "Freddie Mac" or "Freddie").  Fannie and Freddie

(collectively, "the Companies") are federally chartered, for-profit, publicly traded

corporations that are in the business of purchasing and guaranteeing mortgages and bundling them into securities.  The Companies are regulated by defendant Federal Housing Finance Agency ("FHFA").

In 2008, in the midst of the Great Recession, FHFA placed Fannie and Freddie into conservatorship—and then, acting in its capacity as conservator on behalf of the Companies, FHFA entered into preferred stock purchase agreements ("PSPAs") with the United States Department of the Treasury ("Treasury").  Under the PSPAs, Treasury made billions of dollars available to Fannie and Freddie in exchange for senior preferred shares of the Companies' stock.  The shares have a liquidation preference that increases as the Companies draw on Treasury's funding commitment and, in the event of liquidation, entitles Treasury to full payment before any other shareholder receives payment.

Over the years, the parties amended the PSPAs from time to time.  In August 2012, FHFA and Treasury amended the PSPAs for the third time in order to restructure the calculation of dividends to be paid to Treasury.  Under this Third Amendment, Fannie and Freddie paid a quarterly dividend to Treasury that was roughly equal to the amount by which their net worth exceeded zero.  In the first iteration of this lawsuit, plaintiffs attacked the Third Amendment by challenging the legality of FHFA.  Among other challenges, plaintiffs alleged that the leadership

structure of FHFA—in particular, the fact that it is headed by a single director who can be removed only for cause—was unconstitutional.

The Court granted defendants' motion to dismiss all of plaintiffs' claims.  ECF No. 70.  The United States Court of Appeals for the Eighth Circuit stayed plaintiffs' appeal pending the Supreme Court's decision in a similar case.  On June 23, 2021, the Supreme Court issued its decision in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), holding that the for-cause removal provision violated the constitutional separation of powers. Following that decision, the Eighth Circuit affirmed this Court's dismissal of all of plaintiffs' claims save for their separation-of-powers claim relating to the removal provision.  *Bhatti v. FHFA*, 15 F.4th 848 (8th Cir. 2021).  On remand, plaintiffs filed a second amended complaint that largely abandons their challenge to the Third Amendment and instead takes aim at Treasury's liquidation preference.

This matter is before the Court on defendants' motions to dismiss plaintiffs' second amended complaint.  For the reasons that follow, defendants' motions are granted, and this case is dismissed with prejudice.

## I.  BACKGROUND

### A.  *Regulatory Structure*

Fannie and Freddie are for-profit, stockholder-owned corporations whose activities include purchasing and securitizing mortgages originated by private lenders.

SAC ¶¶ 12–14.  From 1992 until 2008, the Companies were regulated by the Office of

Federal Housing Enterprise Oversight ("OFHEO").  SAC ¶ 16.

In July 2008, after the subprime mortgage crisis triggered the Great Recession,

Congress passed the Housing and Economic Recovery Act ("HERA"), Pub. L. 110-289,

122 Stat. 2654 (July 30, 2008).  SAC ¶ 17.  HERA established FHFA as the successor to

OFHEO.  SAC ¶ 17; 12 U.S.C. § 4511.  FHFA is headed by a single director nominated

by the President and confirmed by the Senate.  12 U.S.C. § 4512(a), (b)(1).  The director

serves a term of five years but can be removed by the President for cause.  *Id.*

§ 4512(b)(2).

HERA gives FHFA the authority to place Fannie and Freddie into a

conservatorship or receivership "for the purpose of reorganizing, rehabilitating, or

winding up the affairs" of the Companies.  12 U.S.C. § 4617(a)(2).  Upon appointment as

conservator or receiver, FHFA succeeds to "all rights, titles, powers, and privileges of

the regulated entity, and of any stockholder, officer, or director of such regulated entity

with respect to the regulated entity and the assets of the regulated entity."  *Id.*

§ 4617(b)(2)(A).  When FHFA acts as a conservator, the agency is "not . . . subject to the

direction or supervision of any other agency of the United States."  *Id.* § 4617(a)(7).  In

addition, HERA limits the extent to which courts may "take any action to restrain or

affect the exercise of powers or functions of the [FHFA] as a conservator . . . ."  *Id.*
§ 4617(f).

### B.  FHFA Directors

Pursuant to statute, FHFA's first director was James Lockhart, who at the time of
the enactment of HERA was serving as director of OFHEO.  SAC ¶ 20.  Lockhart
resigned as FHFA director in August 2009.  Am. Compl. ¶ 42.[1]  President Obama then
designated deputy director Edward DeMarco to serve as acting director.  Am. Compl.
¶ 43; *see* SAC ¶ 40.  In November 2010, Obama nominated Joseph Smith, Jr., to serve as
FHFA director.  Am. Compl. ¶ 44.  The Senate failed to confirm Smith, however.  Am.
Compl. ¶ 44.  In May 2013, Obama nominated Melvin Watt to serve as FHFA director.
SAC ¶ 40.  Watt was confirmed by the Senate in December 2013 and sworn into office
the following month.  Am. Compl. ¶ 44; *see* SAC ¶ 42.

Watt's term expired in January 2019.  SAC ¶ 48.  President Trump appointed an
acting director, who took office on January 6.  SAC ¶ 48.  The acting director was later
succeeded by Trump's nominee Mark Calabria, who was confirmed by the Senate in
April 2019.  SAC ¶ 74.

---

[1]The Court cites to plaintiffs' earlier pleadings to provide additional, uncontested
background.

### C. The Conservatorship and the PSPAs

As noted, FHFA placed Fannie and Freddie into conservatorship on September 6, 2008.  SAC ¶ 20.  The next day, Fannie and Freddie (acting through their conservator, FHFA) entered into the PSPAs with Treasury.  SAC ¶¶ 20–21.  Under the original PSPAs, Treasury committed to provide the Companies up to $100 billion each in funding.  SAC ¶ 21.  For any quarter in which a Company's liabilities exceeded its assets, the PSPAs authorized the Company to draw on Treasury's commitment.  SAC ¶ 21.  In return, Treasury received a million shares of senior preferred stock in the Companies and warrants entitling it to purchase up to 79.9 percent of the Companies' common stock at a nominal price.  SAC ¶¶ 22, 24.

Treasury's preferred stock has a liquidation preference of $1 billion, which increases by one dollar for every dollar the Companies draw on Treasury's funding commitment.  SAC ¶¶ 24–25.  In the event of liquidation, Treasury will be entitled to recover the full amount of its preference before any other stockholder receives payment.  SAC ¶ 25.  Treasury was also entitled to quarterly dividends, which, under the original PSPAs, the Companies could elect to pay by increasing the amount of the liquidation preference.  SAC ¶ 26.

The PSPAs have been amended several times.  In May 2009, the parties doubled Treasury's funding commitment from $100 billion to $200 billion.  SAC ¶ 29.  In

December 2009, the parties increased the funding commitment even more, establishing a formula that permits Treasury's funding commitment to exceed $200 billion.  SAC ¶ 29.  By the summer of 2012, Fannie and Freddie had drawn a total of $187 billion from Treasury and the liquidation preference stood at approximately $117 billion for Fannie and $72 billion for Freddie.  SAC ¶ 31.

In August 2012, the parties entered into the Third Amendment, also called the "Net Worth Sweep," which, as noted, was the original focus of this case.  The Third Amendment replaced the original fixed-rate dividend with a dividend equal to the amount by which the Companies' net worth exceeded zero, less a capital buffer.  SAC ¶ 34.

In September 2019 and again in January 2021, the PSPAs were amended to permit the Companies to retain more of their earnings.  SAC ¶ 77.  These amendments effectively eliminated the Net Worth Sweep and suspended the Companies' quarterly dividend payments.  *Collins*, 141 S. Ct. at 1774–75.  Both amendments also increased the liquidation preference at a time when FHFA was headed by Trump appointee Calabria.  SAC ¶ 77.

Plaintiffs filed this action in June 2017, and this Court later dismissed all of the claims in plaintiffs' amended complaint, including their claim that the for-cause removal restriction applicable to the FHFA director is unconstitutional.  ECF No. 70.  As

noted, in *Collins*, the Supreme Court disagreed with this Court and found that the restriction is unconstitutional. *Collins*, 141 S. Ct. at 1770. Following *Collins*, the Eighth Circuit remanded this case for this Court to determine whether the removal restriction somehow caused compensable harm to plaintiffs. *Bhatti*, 15 F.4th at 854.

Plaintiffs then filed a second amended complaint, which, as noted, largely abandoned their attack on the Net Worth Sweep. Instead, plaintiffs now claim that they are entitled to an order that altogether eliminates Treasury's liquidation preference. According to plaintiffs, the unconstitutional removal restriction prevented Trump from achieving his policy goals of releasing the Companies from conservatorship and ending government ownership of the Companies by selling Treasury's common stock at a "large profit." SAC ¶ 49. Had Trump been able to appoint his chosen director in January 2017 instead of having to wait until January 2019, plaintiffs allege, the Trump administration would have achieved these goals—and, according to plaintiffs, in the course of achieving these goals, the Trump administration would have eliminated the liquidation preference.

Specifically, plaintiffs allege that, to achieve its policy goals, the Trump administration would have taken the following steps: (1) amended the PSPAs to eliminate the Net Worth Sweep; (2) ended the quarterly dividend payments to Treasury; (3) developed a regulatory framework for determining the amount of capital

that the Companies would be required to maintain once they were under private control; (4) developed regulatory and business plans for raising the capital necessary to exit conservatorship; and (5) changed the Companies' capital structure so that their earnings would not go exclusively to Treasury in the form of dividends or (in the event of any future liquidation) the liquidation preference.  SAC ¶¶ 76–81.  Plaintiffs allege that two years was insufficient for the Trump administration to complete these steps and that they are therefore entitled to an injunction requiring defendants to either (1) reduce Treasury's liquidation preference to zero or (2) convert Treasury's senior preferred stock to common stock (which would also serve to eliminate the liquidation preference).  SAC at 46 ¶ 2.  Plaintiffs bring a constitutional claim and three claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.

## II.  ANALYSIS

### A.  Standard of Review

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Perez v. Does 1–10*, 931 F.3d 641, 646 (8th Cir. 2019).  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007).  The complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d).  But the court may consider materials that are necessarily embraced by the complaint as well as any exhibits attached to the complaint without converting the motion into one for summary judgment.  *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

### B.  *Collins*

This matter is before this Court on remand in light of *Collins*, which held that the removal restriction on the FHFA director was unconstitutional and remanded for a determination of "what remedy, if any, the shareholders are entitled to receive on their constitutional claim."  *Collins*, 141 S. Ct. at 1770.  The Court therefore begins with a discussion of *Collins*, focusing on the scope of relief that *Collins* envisions in cases involving an unconstitutional removal restriction on the head of an executive agency.

*Collins*, like the earlier iteration of this case, involved a challenge to the Third Amendment.  *Id.*  As noted, the Supreme Court agreed with the plaintiffs that the removal restriction on the FHFA director was unconstitutional.  *Id.* at 1783.  The Court also held, however, that Edward DeMarco, the acting director who oversaw the

adoption of the Third Amendment, was removable at will.  *Id.*  As a result, the Court

explained, there was no basis for setting aside the Third Amendment in its entirety.  *Id.*

at 1787.

More importantly for purposes of this case, the Court went on to explain that,

even with respect to Senate-confirmed directors, "there is no reason to regard any of the

actions taken by the FHFA in relation to the third amendment as void."  *Id.*  This is

because, the Court explained, all of the directors in question were properly *appointed*.

*Id.*  Consequently, the Court said, "there is no basis for concluding that any head of the

FHFA lacked the authority to carry out the functions of the office."  *Id.* at 1788.

That conclusion would seem to foreclose the possibility of any relief.  Curiously,

however, the Court went on to explain that the plaintiffs may nevertheless be entitled to

some relief:

> Although an unconstitutional provision is never really part
> of the body of governing law (because the Constitution
> automatically displaces any conflicting statutory provision
> from the moment of the provision's enactment), it is still
> possible for an unconstitutional provision to inflict
> compensable harm.  And the possibility that the
> unconstitutional restriction on the President's power to
> remove a Director of the FHFA could have such an effect
> cannot be ruled out.  Suppose, for example, that the
> President had attempted to remove a Director but was
> prevented from doing so by a lower court decision holding
> that he did not have "cause" for removal.  Or suppose that
> the President had made a public statement expressing
> displeasure with actions taken by a Director and had

> asserted that he would remove the Director if the statute did
> not stand in the way.  In those situations, the statutory
> provision would clearly cause harm.

*Id.* at 1788–89.  The Court went on to say that the "present case . . . is less clear-cut" and

remanded for the parties' arguments to be resolved in the first instance by the lower

courts.  *Id.* at 1789.

To be honest, this passage is baffling, and the parties and this Court have

struggled to make sense of it.  The Supreme Court says that the unconstitutional

removal restriction was *never* part of the governing law.  In other words, the President

*always* had the power to remove the FHFA director (much like, in the *Wizard of Oz*,

Dorothy always had the power to return to Kansas).  *Cf. id.* at 1793 (Thomas, J.,

concurring) ("while the [removal] provision *does* conflict with the Constitution, the

Constitution has always displaced it and the President has always had the power to fire

the Director for any reason").  Combined with the Court's holding that every FHFA

director had full authority to carry out the functions of his office, it is hard to imagine

how the removal restriction *that never had legal effect* could have caused any legally

cognizable harm, as any harm would have been due to the President's own mistake of

law and not to any unlawful action by a director.[2]

---

[2]The Court sets aside the hypothetical situation in which the President attempted
to remove the director but was blocked from doing so by court order, as there is no
allegation that any such attempt was ever made in this case.

-12-

Nevertheless, immediately after explaining that every FHFA director had the authority to carry out the functions of his office and that the removal restriction was and always had been a legal nullity, the Court opined that the plaintiffs could, theoretically, establish that they were harmed by the (non-existent) removal restriction. Outside the context of a President actually attempting to remove a director and being legally enjoined from doing so—a situation in which it is at least plausible to regard the director's subsequent actions as *ultra vires*—it is difficult to know what to make of this statement. The core of the Court's analysis is that, while the *removal restriction* is unconstitutional, that fact does not render the *agency's actions* unconstitutional. How, then, could the plaintiffs possibly be entitled to any remedy?

In his *Collins* concurrence, Justice Thomas suggested a way out of this conundrum. As Justice Thomas observed, the majority opinion "glossed over a fundamental problem with removal-restriction cases such as these: The Government does not necessarily act unlawfully even if a removal restriction is unlawful in the abstract." *Id.* at 1789 (Thomas, J., concurring). While a government official's mistaken belief about the scope of his own authority does not render an otherwise lawful act unlawful, Justice Thomas suggested that, in certain cases, the agency action may be subject to challenge under the APA as "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* at 1794 n.7 (quoting 5 U.S.C. § 706(2)(A)).

-13-

Having puzzled over the matter at length, the Court concludes that Justice Thomas's suggestion is the only way to harmonize the seemingly contradictory language in the majority opinion. Justice Thomas both recognizes that every FHFA director had the authority to carry out the functions of his office and leaves a path open for a litigant with standing to show that a particular agency action was arbitrary and capricious for purposes of the APA because the action was attributable to the agency's incorrect belief that the director was removable only for cause. Importantly, such claims would not be *constitutional* claims, because, again, every director had full authority to carry out the functions of his office. *Collins*, 141 S. Ct. at 1788.[3]

With this framework in mind, the Court turns to plaintiffs' claims.

### C.  Count I

In Count I of their complaint, plaintiffs allege that they were harmed by the unconstitutional removal restriction. As discussed above, however, plaintiffs cannot directly attack any of the agency's actions as unconstitutional. Instead, plaintiffs can only seek a remedy for the agency's actions under the APA by identifying an agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Collins*, 141 S. Ct. at 1794 n.7 (Thomas, J., concurring).

---

[3]Again, the Court sets aside cases in which a President was legally restrained from removing a director by a court order.

Plaintiffs disagree.  They allege that, but for the unconstitutional removal restriction, Trump would have immediately fired FHFA director Mel Watt and installed his own FHFA director on the first day of his administration.  As a result, plaintiffs argue, the burden shifts to defendants to prove that the agency would have taken the same actions under Trump's director as it took under Watt.  Essentially, plaintiffs contend that everything the agency did under Watt's leadership during the Trump administration is *ultra vires*.  To bolster their claim, plaintiffs attach an unsworn November 2021 letter from Trump to a politician asserting that he would have fired Watt on the first day of his administration.  SAC Ex. A.

Plaintiffs' legal theory reads far too much into *Collins*.  *Cf. Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 632 (5th Cir. 2022) (explaining that, under *Collins*, "[i]t is thus not enough . . . for a challenger to obtain relief merely by establishing that the unconstitutional removal provision prevented the President from removing a Director he wished to replace"), *pet. for cert. filed* No. 22-448 (U.S. Nov. 14, 2022).  As discussed above, *Collins* makes clear that every FHFA director had the authority to carry out the functions of his office.  The Supreme Court remanded for a determination of whether the plaintiffs could nevertheless show that they were harmed, but the Court clearly left open the issue whether the plaintiffs were entitled to any remedy at all.  *See Collins*, 141 S. Ct. at 1770 ("we remand for further proceedings to determine what remedy, *if any*,

the shareholders are entitled to receive on their constitutional claim" (emphasis added)).

True, the Court identified two examples of circumstances in which the removal provision would "clearly cause harm":  (1) if "the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have 'cause' for removal"; and (2) if "the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way."  *Id.* at 1789.  Pointing to Trump's November 2021 letter, plaintiffs contend that they fit into the latter category.

The Court disagrees.  To begin with, the Supreme Court did not state that these circumstances would render the agency's actions unconstitutional—and, indeed, the entire tenor of the Court's previous discussion indicates that the agency at all times acted within constitutional limits.  Instead, the Court was careful to say, simply, that it could not "rule[] out" the possibility that the unconstitutional provision inflicted compensable harm.  *Id.*  As discussed above, the only way to make sense of this discussion is to view these claims as challenges to agency action that has (allegedly) been tainted by an improper consideration, which is a statutory challenge, not a constitutional one.  Plaintiffs' constitutional claim therefore fails.[4]

_____

[4]The Court notes that plaintiffs' second amended complaint—which was filed
(continued...)

Even if the type of claim that *Collins* seems to contemplate is properly considered a constitutional claim, plaintiffs have failed to state such a claim.  The Supreme Court described a situation in which a President, while in office, publicly criticized the director and publicly stated that he would remove the director but for the President's (mistaken) belief that he lacked that authority.  *Id.* ("Or suppose that the President *had made* a public statement expressing displeasure with actions taken by a Director and *had asserted* that he *would* remove the Director if the statute did not stand in the way." (emphasis added)).

Requiring a contemporaneous expression of displeasure and a desire to remove makes sense.  *Collins* clearly rejected the notion that an unconstitutional removal restriction automatically renders the agency's every action void, and it would be far too easy for a *former* President—motivated perhaps by a desire to harm a political rival or force a new administration to implement his preferred policies—to circumvent this holding with after-the-fact assertions about what he would have done if he had only known he had the authority.  Before opening the door to such a claim and throwing the government into chaos by undermining years' worth of agency action—not to mention interfering with the policies of a duly elected succeeding administration—courts should

---

[4](...continued)
after *Collins* was decided—also requests a declaration that the removal restriction is unconstitutional.  SAC at 46 ¶ 1.  This claim for relief is moot, as *Collins* definitively established that the removal restriction is unconstitutional.

-17-

require a very strong showing that the former President in question would, in fact, have fired the director and would, in fact, have been successful in implementing the action that the plaintiffs allege would have occurred if the President had not been mistaken about the scope of his removal authority.  *Cf. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 51 F.4th at 632 ("We distill from these hypotheticals three requisites for proving harm: (1) a *substantiated* desire by the President to remove the unconstitutionally insulated actor, (2) a perceived inability to remove the actor due to the infirm provision, and (3) a nexus between the desire to remove and the challenged actions taken by the insulated actor." (emphasis added)).

In addition, *Collins* was explicit that the President's criticism and desire to remove the agency director must be *publicly* expressed.  *Collins*, 141 S. Ct. at 1789. Again, this make sense.  A public statement would put the public on notice that the director's subsequent actions may rest on a shaky legal foundation.  Due regard for the enormous reliance interests of the American public in the regular functioning of government likewise calls for a very high showing before courts entertain such claims. As plaintiffs have not alleged that Trump, while in office, ever *publicly* criticized Watt or *publicly* expressed a desire to remove him, they have failed to state the type of claim contemplated in *Collins*.

Finally, the Court notes that, even if plaintiffs had stated the type of claim contemplated in *Collins*, the nature of their claim is far too speculative to survive a motion to dismiss. Pointing to the Trump administration's broad policy goal of ending the conservatorships—the type of broad policy goal that Presidents express far more often than achieve—plaintiffs construct an alternate history spanning over two years in which Trump achieves his goals. In constructing this alternate history, plaintiffs identify a number of steps that they claim Trump would have taken and insist that Trump would have taken these steps in a particular order. Plaintiffs further claim that they are entitled to pluck out and impose one of those steps—eliminating the liquidation preference—even though they can point to only one fragment of one document that even suggested that step as an *option*, SAC ¶ 59, and absolutely nothing showing that Trump himself (whose opinion on the matter is the central issue) had ever *contemplated* that step, much less regarded that step as necessary or important. *Cf. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 51 F.4th at 633 ("These secondhand accounts of President Trump's supposed intentions are insufficient to establish harm."). Considering the combination of shifting political winds, changing priorities over time, the number of actors involved, and the vagaries of political, economic, and world events that can arise

-19-

over such a timeframe and consume an administration's attention and political capital,[5]

plaintiffs' claims are an exercise in rank speculation.

Plaintiffs' own allegations illustrate this. For example, plaintiffs cite a May 2021

interview with a former Trump administration Treasury official in which the official

stated that the administration decided to wait for a Trump-appointed FHFA director to

pursue ending the Companies' conservatorships. SAC ¶ 69. But as defendants point

out, the full interview actually *undermines* plaintiffs' allegations. The official identified

numerous reasons for the failure to end the conservatorships—in addition to the

holdover Obama director—including that Treasury's recommendation to end the Net

Worth Sweep as part of Trump's first proposed budget met with significant pushback

because it would increase the deficit and that Treasury had other priorities (including

tax and bank-regulatory reform) that took precedence over dealing with the

conservatorships.[6] The official also noted that the views of Watt (the holdover Obama

director) "w[ere] not terribly different than Director Calabria's," that Watt thought the

conservatorships should end, "felt very strongly" that the Net Worth Sweep should

---

[5]To mention just two prominent examples: the December 2019 impeachment and the COVID-19 pandemic.

[6]Interview by Tim Rood with Craig Phillips, SitusAMC, 7:10–10:10, *available at* https://www.situsamc.com/resources-insights/podcasts/hill-episode-10-craig-phillips-former-counselor-us-secretary-treasury (cited in SAC ¶ 69).

end, and "would have actually done almost anything we wanted to do."[7]  Given the

enormous number of variables at play, no factfinder could determine, with any

confidence, that the failure to achieve the broad policy goal of ending the

conservatorships was due solely to Watt's presence.  Nor could a factfinder determine,

with any confidence, that ending the conservatorships would necessarily have meant

eliminating the entire liquidation preference.  Writing alternate histories of this sort is

the work of fiction authors, not federal judges.

For all of these reasons, Count I is dismissed.

*D.  APA Claims*

Like their constitutional claim, plaintiffs' APA claims are based on their alternate

history concerning what would have happened if Trump had understood that he had

the authority to appoint his own FHFA director in January 2017.  As a result, the APA

claims are also too speculative to survive a motion to dismiss.  Setting that aside,

plaintiffs' APA claims also fail for several independent reasons.

---

[7]*Id.* at 10:28–10:52.  In this regard, it is worth noting that there is no allegation that Watt ever refused to do anything that the Trump administration asked him to do.

1.  Counts II and III

In Counts II and III of their complaint, plaintiffs complain of unlawful agency action.  Count II seeks to set aside agency action "contrary to constitutional right, power, privilege, or immunity," *see* 5 U.S.C. § 706(2)(B), and Count III seeks to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *see id.* § 706(2)(A).  As discussed above, *Collins* makes clear that, while the removal restriction was unconstitutional, that does not render the agency's actions unconstitutional.  Count II therefore fails for that reason alone.

Even more fundamentally, to state a claim under the APA for unlawful agency action, a plaintiff must identify the agency action at issue.  Plaintiffs' second amended complaint entirely fails to do so.  In their *briefing*, plaintiffs claim that they are challenging quarterly dividends and increases in the liquidation preference.[8]  ECF

---

[8]Plaintiffs also suggest that the PSPA provisions that grant Treasury a liquidation preference constitute the relevant agency action.  ECF No. 103 at 20.  (When citing by ECF number, the Court cites to the page numbers generated by the Court's docketing system.)

This is not a serious suggestion.  The provisions creating the preference are in the original PSPAs, which were entered into in 2008, SAC ¶¶ 20, 24–26—long before Trump took office and nearly nine years before plaintiffs brought this action.  Any challenge to these provisions is almost certainly barred by the statute of limitations, *Izaak Walton League of Am., Inc. v. Kimbell*, 558 F.3d 751, 758–59 (8th Cir. 2009) (applying 6-year statute of limitations to APA claims), and in any event plaintiffs allege no facts in their second amended complaint that could possibly establish that the PSPAs themselves are somehow unlawful.

No. 103 at 19. But a plaintiff cannot amend his complaint in his briefing, *Fischer v. Minneapolis Public Schools*, 792 F.3d 985, 990 n.4 (8th Cir. 2015), and nowhere in their *complaint* do plaintiffs identify these payments and increases as the relevant agency action. To the contrary: The second amended complaint is devoid of factual allegations concerning the operation of either the Net Worth Sweep or the liquidation preference during the first two years of the Trump administration. Indeed, plaintiffs' second amended complaint does not even allege that there *were* any dividend payments or increases in the liquidation preference during those two years, much less identify the dates, the amounts, or (for the liquidation preference) the contractual provision under which they took place. The second amended complaint is also silent about what agency actions FHFA took during that period of time to implement those contractual provisions.

Setting that aside, plaintiffs' theory, as pleaded in their complaint, does not square with any claim that they were harmed by particular dividend payments or particular increases in the liquidation preference. Plaintiffs claim that they are entitled to an injunction completely eliminating the liquidation preference because, according to plaintiffs, that is what would have happened in their imagined world in which Trump appointed his own FHFA director in January 2017. In other words, plaintiffs' entire theory is premised on a *failure* to act—specifically, the agency's failure to eliminate the

liquidation preference.  The damage is not that the preference increased on any

particular date; if plaintiffs are entitled to eliminate the preference entirely, then any

individual incremental increase would be irrelevant.

Indeed, confronted with the inconvenient fact that, under Trump's chosen

director, FHFA twice agreed to *increase* the liquidation preference—a fact not

mentioned, much less explained, by Trump in his letter to the politician—plaintiffs

contend that those increases were all part of the Trump administration's overall strategy

to maximize Treasury's profit while working to end the conservatorships.  SAC ¶¶ 77,

82.  If that is true, however, then there is no coherent explanation for how earlier

increases in the liquidation preference could have harmed them.  That is particularly

true in light of the fact that, according to plaintiffs, eliminating the preference had to be

the *last* step in getting the Companies out of conservatorship.  ECF No. 103 at 44.  In

other words, even in the world imagined by plaintiffs, the liquidation preference would

still have been in place during the first two years of the Trump administration and the

same increases (which, again, are not alleged in their second amended complaint)

would presumably still have taken place.  *See* SAC ¶ 86 (alleging that, had Trump been

able install his own director immediately, the Companies would have sold new shares

of common stock in 2019, after first removing the liquidation preference).

Relatedly, plaintiffs' contention that they were harmed by specific increases in the liquidation preference is completely inconsistent with the magnitude of the relief they are seeking. By the summer of 2012—when FHFA was headed by DeMarco, an acting director removable at will—the liquidation preference stood at a combined $189 billion. SAC ¶ 31. As noted, plaintiffs do not allege any facts concerning what happened to the liquidation preference during the first two years of the Trump administration. Nor do they explain why any incremental increase that may have occurred during those two years would entitle them to wipe out Treasury's entire liquidation preference, including the $189 billion that had accrued by the summer of 2012, much of which presumably accrued under DeMarco's tenure and is therefore immune from individual attack. The reason for this lack of explanation is simple: plaintiffs are not really attacking these individual increases. They are attacking the agency's failure to get rid of the liquidation preference altogether.

As for the dividend payments during those years, plaintiffs do not articulate any theory explaining how, given that the Third Amendment has since been eliminated, they were harmed by those particular payments. Nor do they explain how those dividend payments, even if illegal, would give them the right to demand the elimination of the entire liquidation preference. And again, this is not even to mention the main problem—that plaintiffs' second amended complaint does not even allege that

there were any dividend payments during the first two years of the Trump administration, nor does it identify any agency action taken to implement any such payments.

In short, it is clear that plaintiffs' claims do not arise out of any particular agency action, but rather rest on the agency's failure to act. As a result, Counts II and III of the second amended complaint fail to state claims for unlawful agency action. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm."); *Preferred Risk Mut. Ins. Co. v. United States*, 86 F.3d 789, 792 (8th Cir. 1996) ("the person claiming a right to review must identify some agency action"); *Whitewater Draw Nat'l Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1010 (9th Cir.) ("It is axiomatic that Plaintiffs must identify an 'agency action' to obtain review under the APA."), *cert. denied*, 142 S. Ct. 713 (2021).

### 2. Count IV

In Count IV, plaintiffs bring a claim under 5 U.S.C. § 706(1), which permits suits to "compel agency action unlawfully withheld or unreasonably delayed." "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Plaintiffs point to no statute or rule that would *require* FHFA and

Treasury to eliminate the liquidation preference.  Instead, they argue that this result

flows from *Collins*, because, they argue, if they prove that they suffered harm from the

removal restriction, defendants would be legally required to remedy that harm.

This argument is spurious.  The language in *Norton* is clearly referring to a

preexisting legal obligation that requires the agency to take specific action.  Were it

otherwise, any plaintiff could bootstrap himself into a § 706(1) claim by alleging harm

from an agency's failure to act and arguing that, if he wins the lawsuit, the agency will

be required to remedy that harm.

Moreover, even if plaintiffs theoretically could prevail on one or more of their

claims, the Court would have broad discretion in crafting a remedy.  *Swann v. Charlotte-*

*Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been

shown, the scope of a district court's equitable powers to remedy past wrongs is broad,

for breadth and flexibility are inherent in equitable remedies.").  Consequently,

plaintiffs cannot claim an entitlement to the particular agency action that they seek.

Count IV therefore fails to state a claim because plaintiffs have not pleaded "a *discrete*

agency action" that the agency is "*required to take.*"

### 3.  Anti-Injunction Clause

Finally, the Court notes that, even if plaintiffs had adequately pleaded claims

under the APA, their requested relief would be barred by 12 U.S.C. § 4617(f) (also

known as the "anti-injunction clause").  Under § 4617(f), with exceptions not relevant

here, "no court may take any action to restrain or affect the exercise of powers or

functions of the [FHFA] as a conservator or a receiver."

In *Collins*, the Supreme Court held that the plaintiffs' statutory claim, which

alleged that FHFA exceeded its authority as the Companies' conservator by adopting

the Third Amendment, was barred by this provision.  *Collins*, 141 S. Ct. at 1775–78.  The

Court explained that § 4617(f) bars relief when the challenged FHFA action fell within

the scope of FHFA's authority to act as the Companies' conservator.  *Id.* at 1776.

Plaintiffs do not dispute that any FHFA action with respect to the liquidation

preference is within the scope of the agency's authority as conservator.  Instead, they

argue that § 4617(f) does not clearly bar relief for their constitutional claims.  *See Webster

v. Doe*, 486 U.S. 592, 603 (1988) ("where Congress intends to preclude judicial review of

constitutional claims its intent to do so must be clear").  As the Court has already

explained, however, plaintiffs do not have a viable constitutional claim because FHFA's

actions were all within its constitutional authority.

Moreover, § 4617(f) does not bar judicial review of constitutional claims; it

simply bars certain types of relief.  The cases on which plaintiffs rely are therefore

inapposite, as they all concern provisions that bar judicial review altogether.  *See

Webster*, 486 U.S. at 603 (rejecting argument that the statute "den[ied] any judicial forum

for a colorable constitutional claim"); *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 680–81 (1986) (rejecting argument that regulations were completely insulated from statutory and constitutional challenge); *Ralls Corp. v. CFIUS*, 758 F.3d 296, 307–12 (D.C. Cir. 2014) (rejecting argument that statute had eliminated jurisdiction over a due-process claim); *Bartlett v. Bowen*, 816 F.2d 695, 703 (D.C. Cir.) ("If we were to credit Congress with an intention to foreclose all judicial review under the Medicare Act, the appellant here would have no judicial forum whatsoever (in either a federal or state court) in which to pursue her constitutional claim."), *opinion reinstated on reconsideration sub nom. Bartlett ex rel. Neuman v. Bowen*, 824 F.2d 1240 (D.C. Cir. 1987).

The Court therefore grants defendants' motions to dismiss.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      Defendants' motions to dismiss [ECF Nos. 91, 98] are GRANTED.

2.      This action is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 16, 2022                    s/Patrick J. Schiltz
                                             Patrick J. Schiltz, Chief Judge
                                             United States District Court